Cunningham, J.
Minnesota Shock, appellee, hereinafter referred to as plaintiff, filed her action in the district court of Barfield county, against the appellants above named, to enforce the specific performance of two certain contracts to which we shall later refer, or for damages, in the event the said contracts could not be enforced.
*200 The facts are substantially as follows: The plaintiff entered into a written contract with the defendant S. A. Corn, who was represented in making the contract, and in all matters hereinafter referred to, by her husband, the defendant J. A. Corn, wherein and whereby it was agreed that a certain hotel property in the city of Grand Junction, then owned by the said S. A. Corn, should be sold to the plaintiff for the sum of $4,000, which amount was to be paid by plaintiff as follows: Plaintiff was to assume a trust deed of $1800, and to pay the balance of $2200 at the rate of $50 per month. In addition to these payments, the plaintiff was to pay interest on the deferred payments, and to pay all taxes that might be legally levied upon said property. Time was made an essential part of this contract, and a forfeiture of all payments was provided for, in the event plaintiff did not perform the conditions imposed upon her by the contract. Under this agreement plaintiff entered into possession of the aforesaid hotel property, and remained in possession of it for practically one year. She soon became in arrears on her payments, indeed, never at any time after the first or second month, did she perform her obligations under the contract. ■ After remaining in possession of the hotel property for but a trifle less than a year, plaintiff entered into negotiations, through a real estate agent in Grand Junction, with the appellant, Eleanora C. Berdineau, whose name at that time was Eleanora C. Skiff, with a view of trading her the plaintiff’s, equity in the Grand Junction property for a ranch owned by Mrs. Berdineau. These negotiations proceeded to a point where plaintiff and Mrs. Berdineau had ap *201 parently reached an agreement, and Mrs. Shock and her husband went to the Skiff ranch, where for several days Mr. Shock remained, working about the ranch, making improvements upon it, and contracting debts with reference to it, while Mrs. Skiff went' to the property at Grand Junction and remained there several days. By virtue of the agreement entered into between plaintiff and the defendant Skiff, the plaintiff was to pay to Mrs. Skiff a certain sum of money in cash, and procure from Mrs. Corn an agreement that plaintiff might assign her contract with Mrs. Corn to Mrs. Skiff, or else have Mrs. Corn enter into a contract for the Grand Junction property directly with Mrs. Skiff, whereby Mrs. Skiff would pay what remained due to Mrs. Corn on the Shock contract. Mrs. Shock was at all times without funds, and was to arrange for the money necessary to pay what she was in arrears on her payments to Mrs. Corn, and the amount of money that she was to pay in cash to Mrs. Skiff, by placing a mortgage on the Skiff land. The dej fendant, Corn, agreed, after much protest, to permit the deal between Mrs. Skiff and Mrs. Shock to go through, providing she was paid in cash a sum of money equal to the sum of all the payments then due her on the original contract between herself and Mrs. Shock. Up to this point there is no serious conflict in the evidence.
While Mrs. Shock was at the ranch and Mrs. Skiff was at the hotel property at Grand Junction, the latter got into communication with Mr. Corn, the result of which was that Mrs. Skiff determined not to close her deal with Mrs. Shock, and so notified the parties holding certain papers in escrow. *202 Mr. Corn entered into possession of the hotel property, and Mrs. Shock came .from the ranch near New Castle to Grand Junction, where she found J. A. Corn in possession. Notwithstanding some quarreling, which seems to have occurred between Mrs. Shock and J. A. Corn after the former returned from the ranch to the hotel property, yet she remained there over night, and later Corn went to the New Castle ranch owned by Skiff, with a view of himself trading the hotel property to Mrs. Skiff for the ranch. There is a conflict in the testimony as to how Corn came to be in possession of the hotel property. He insists that Mrs. Skiff told him that it was not what it had been represented to her to be, and that she did not want it and would not have it, and that there was nothing for him to do but take possession of the property, since there was no one there to look after it. Mrs. Skiff testifies, on the other hand, that Corn insisted on her turning the possession of the property over to him, and that she •did so because of his importunities.
Plaintiff, contends that Mrs. Skiff and the two Corns entered into a conspiracy whereby the former wrongfully turned over the possession of the property to the latter, and that the purpose of their conspiracy was to wrongfully deprive plaintiff of the possession of the property. We think the conspiracy charge is the principal ground of the complaint, and unless a conspiracy has been proven, the motion for a nonsuit interposed by defendants ought to have been granted. We will now examine the conspiracy charge.
The only evidence offered that even tends to support the charge of conspiracy, as we read the *203 record, is the negotiations between Corn and Skiff, after the former had taken possession of the hotel property, looking to an exchange of the two prop- ' erties. Bnt these negotiations, the evidence clearly shows, were entered into between Mrs. Skiff and Mr. Corn with the full knowledge and approval of plaintiff. Mr. Corn testifies that during the' evening that Mrs. Shock returned from the ranch to the hotel and found him in possession, “the conversation ran on the Skiff ranch, and by her (plaintiff’s) •request, and Mr. Telton’s, I went up there on Friday. ’ ’ The witness here means that he went to the Skiff ranch at New Castle to look it over. Later" on he testified: ‘ ‘ Mrs. Shock agreed that if I would trade for the property (meaning the Skiff ranch) she would pay me the cash for it, that is, for the Skiff ranch.” In the face of such testimony, which was in no wise contradicted, it is idle to contend that plaintiff did not know all about and approve the negotiations between Corn and Mrs. Skiff. There is no other evidence whatever which even tends to show a conspiracy. Therefore, the judgment as against the defendant J.' A. Corn and Eleanora C. Berdineau cannot possibly be sustained on the ground of a conspiracy. It cannot be sustained against Mrs. Berdineau on the ground that she violated the agreement which she had entered into with plaintiff, whereby the hotel property was to be exchanged for the ranch property, for the reason that no attempt whatever was made by plaintiff to secure the consent in writing of the Corns to an assignment of her contract with Mrs. Corn, nor did she tender or procure a new. contract running from Mrs. Corn to Mrs. Berdineau in lieu of the one *204 which she, the plaintiff, held. Indeed, the evidence plaintiff shows that she would have been utterly unable to have procured any such written agreement or contract from Mrs. Corn. Moreover, the evidence clearly shows that plaintiff voluntarily left the ranch and went to Grand Junction for the purpose of taking possession of the hotel property, and she testifies herself, repeatedly, that she went to Grand Junction for that purpose. The following appears from the testimony of Mrs. Shock in the abstract: “If Mrs. Skiff wanted to trade back properties, I was willing to -be reinstated back as I was,” and again she says, “I went to Grand Junction. If Mrs. Skiff wanted to come back to the ranch, I was willing to go back to Grand Junction and take my property back and be reinstated.” She did go back to Grand Junction, and entered the house and remained there over night, and while she had a quarrel or dispute with Mr. Corn, who seems to have remained there in the house over night, she was at the property during the time he, Corn, went to the Skiff ranch to look it over, and there is no evidence to indicate that she might not have remained in possession of it had she insisted on doing so. Plaintiff was in no position to enforce the specific performance of the contract which she had entered into with Mrs. Corn for the reason that she had not performed its conditions. She had not met the payments promptly, indeed, the record shows she had paid, at the time she entered into the trade with Mrs. Berdineau, only about one-half of what the contract called for, even if we accept her own figures as to what she had paid. Corn contends that she had paid much less than that amount. Plaintiff contends, *205 however, that Corn has waived his right to insist upon these back payments by accepting money from her whenever he could get it. Even granting this to be true, before she could insist upon the specific performance of the contract, it would be necessary for her to tender the amount in arrears. In her complaint she attempts to meet this obligation with the following allegation: “that the plaintiff is now and has at all times been willing and ready to carry out the provisions of both of said agreements, and has kept and performed all of the provisions of each thereof fully and in detail insofar as they were to be kept and performed by her; and that the failure to carry out both of said agreements in detail has been wholly due to the wrongful and concerted actions of all three of said defendants.” This is not a tender of the amount which was confessedly due to the Corns, nor was any tender made on the trial, nor was there any proof offered to support the allegation of the complaint set forth above. Her only excuse for not having met the payments promptly was the wretched condition she found the house in and the large outlay necessary to put it in a proper condition. This is no defense, as she must have known the condition of the house when she traded for it. On the trial Mr. Corn gave the following testimony: “I told her ‘you know I have been good to you, and have been lenient to you, and you are behind now. I want to know whether you are going to pay me up.’ She said she knew I had, but she didn’t know whether she would pay me or not, but said: ‘I have got the dough.’ ” This alleged conversation between the plaintiff and Mr. Corn occurred on the night that Mrs. Shock re *206 turned from the ranch to the hotel and fouüd him in possession. Plaintiff, although called to the stand thereafter, makes no attempt to' dispute or contradict the statement of the witness Corn, just quoted.
Counsel for appellee say in their brief: “In taking illegal possession he (Corn) was a trespasser on the premises embraced in said contract.” We think it clear that if Corn was liable in this case at all, that his liability was that of a trespasser. If the liability of Corn as a trespasser, by reason of his general agency and supervision of his wife’s affairs, made her liable, then her liability was also that of a trespasser. Accepting, arguendo, counsel’s position in this respect as the true one, it is difficult to conceive how plaintiff could properly invoke the aid of a court of chancery; or how a simple trespass by Corn could confer upon plaintiff the right to have the two contracts specifically performed. We are not disposed to agree with appellee ’s statement, made in her brief, that there is anything appearing in the answer of defendants which would prevent the court from compelling specific performance of the contract entered into between plaintiff and defendant Skiff, if the same were proper. It is true the answer of .the defendants S. A. and J. A. Corn recites a foreclosure of the trust deed on the hotel property, but there is nothing whatever in the answer, or the evidence, as stated in the brief, to support the statement that this foreclosure was brought about by measures adopted by the Corns or either of them. Moreover, it was the duty of plaintiff, under the original contract existing between herself and Mrs. Corn, to prevent the property from being sold to satisfy the trust deed. *207 At least she assumed, which would carry with it the obligation of discharging, this lien. The answer, does not allege that the sale under the foreclosure had ripened into a deed, but on the contrary, that only a certificate of purchase had been issued. But there is yet another and a conclusive reason why the complaint in this case is insufficient to support an action for specific performance, or the judgment that was rendered. It goes without saying that the judgment rendered for damages is improper, unless the court might have decreed specific performance but for some change in the title' of the property which made such relief impossible. Specific performance could not be enforced against Mrs. Skiff unless first Mrs. Corn could be compelled by a decree of the court to enter into a new contract' between herself and Mrs. Skiff, or consent in writing to the assignment of the old one. Granting that J. A. Corn, on behalf of his wife, had promised and agreed to enter into a new contract with Mrs. Skiff, providing all the payments then due to his wife on the original contract should first be liquidated, still, such promise on his part was without consideration, and therefore a nudum pactum agreement. Even had plaintiff met the requirements and made the payments then long past due, (which she did not do or offer to do), still, she could not compel Corn to keep his agreement, because she would have by such payments simply performed what, by the original contract, she was required to do, and this, under all the authorities, would constitute no consideration for the new agreement.
We think it plain that plaintiff, under her pleading and the proof, was not entitled to' equitable re *208 lief against any of the defendants. The case will, therefore, be reversed, with instructions that an order be entered by the trial court dismissing the cause at plaintiff’s costs, which is accordingly done.

Reversed.

Walling, Judge, not participating.